| | |
|---|---|
| NCL (BAHAMAS) LTD., d/b/a NORWEGIAN CRUISE LINE, <br><br> Plaintiff, <br><br> v. <br><br> O.W. BUNKER USA, INC. and KELLY BEAUDIN STAPLETON, Liquidating Trustee of the OWB USA Liquidating Trust, <br><br> Defendants. | 3:17-CV-1327 (CSH) <br><br><br><br> November 29, 2017 |

## RULING ON PLAINTIFF'S MOTION TO STAY OR ENJOIN ARBITRATION

**HAIGHT, Senior District Judge:**

This declaratory action pits the owner of a Bahamas-flag ocean going passenger ship against the American affiliate of a Danish supplier of marine fuel oils who contracted with the shipowner to fuel the vessel at a Greek port, and initiated arbitration proceedings in London when the shipowner refused to pay the invoice for that fueling.

The shipowner, invoking the Declaratory Judgment Act, 28 U.S.C. § 2201, seeks a declaration that it is not liable to pay that invoice and is not obligated to arbitrate the supplier's claim that it should do so, and now moves [Doc. 2] for an order of this Court staying or enjoining the arbitration, in London or elsewhere. The American supplier resists that motion. This Ruling resolves it.

The means of propelling ships across the world's oceans has changed over the centuries. In the age of sail shipowners utilized the winds, free of charge but subject to uncontrollable vagaries; in May 1588, for example, the Spanish Armada was bound for England but "the wind was blowing hard off the sea, right down the throat of the passage," and "blockaded by the elements, the Armada lay for almost three weeks anchored off Belem" in Portugal. Garrett Mattingly, *The Armada* 245-46 (1959). That complication changed when "in the 1840s, steam propulsion began to seriously compete with sail on the high seas." Alex Roland, W. Jeffrey Bolster, & Alexander Keyssar, *The Way of the Ship* 158(2008). "The introduction of steam gave rise to a new naval requirement – coal – which soon became vital. Commerce under steam quickly settled down upon fixed routes, and depots of coal were established to meet its needs." *Encyclopedia Britannica* (1911 edition).

The limitations and disadvantages of coal gave rise in turn to its replacement by fuel oil as the means of propulsion for ocean-going ships. "Bunker fuel," the name commonly acquainted with marine use, is descended from the days of coal. This general term for marine fuel oil "is a legacy from the early days of shipping when coal was the main source of fuel and the coal was loaded into *coal bunkers*." 5 Paul A. Russell & E.A. Stokoe *Reeds Marine Engineering and Technology: Ship Construction for Marine Engineers* 9 (6th ed. 2016). Liquid bunker fuel is now stored aboard ship in "bunker tanks." *Id.* The word "bunker" is also used as a verb: "[t]he operation of filling or replenishing a ship's bunker with fuel is known as bunkering." *The Oxford Companion to Ships and the Sea* 119 (Peter Kemp ed., 1st ed. 1976). The use of bunker fuel remains to this day the means of propelling the world's merchant fleets. While naval nuclear propulsion is used within naval warships such as supercarriers and submarines, nuclear-powered non-combatant vessels have not

developed beyond a few experimental ships.  J.P. Ghose & R.P. Gokarn, *Basic Ship Propulsion* 3 (2004).

II

Until very recently, a leading company in the global business of refueling ships was O.W. Bunker, a Danish company founded in 1980, and by October of 2014 the world's largest bunker supplier.[1]  According to publicly available business publications, O.W. Bunker owned and directly supplied to vessels some deliveries of bunkers, but for the most part the Danish entity conducted its world-wide business by setting up regional affiliated corporations, which would in turn sub-contract with local suppliers to fuel a particular ship on a particular date at a particular port.  That commercial practice is illustrated by the case at bar, which arises in the following manner.

Plaintiff NCL (Bahamas) Ltd., doing business as Norwegian Cruise Lines ("NCL"), is, despite its nordic name, a Bahamas corporation with its principal place of business in Miami, Florida.  At the pertinent times, NCL owned and operated, among other vessels, the passenger ship M/V NORWEGIAN SPIRIT, a 75,904 gross ton vessel flying the Bahamas flag with a guest capacity of 2,018 (double occupancy).  A time came in October, 2014 when the NORWEGIAN SPIRIT required refueling at the port of Pireaus, Greece.

On October 8, 2014, NCL ordered bunkers to be delivered to the NORWEGIAN SPIRIT (hereafter sometimes "the Vessel") at Pireaus on October 18, 2014.  NCL placed that order with Defendant O.W. Bunker USA Inc. ("O.W. USA"), a Texas corporation and a wholly owned affiliate of a Danish company, O.W. Bunker.  O.W. USA's sales order confirmation, dated October 8, 2014,

---

[1]  Some documents in the record and pleadings in other jurisdictions omit the periods in the name of this company, rendering it as "OW Bunker."  The prior pleadings in this case use the name "O.W. Bunker."  This Ruling uses the latter version.

and addressed to NCL [Doc. 2-2], recited under the caption "Terms":

> The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as "Buyer" and to O.W. Bunker USA Inc. as "Seller."

O.W. USA thereupon placed an order for the bunkers destined for the NORWEGIAN SPIRIT with O.W. Bunker Malta Ltd. ("O.W. Malta"), another affiliate of the Danish company. O.W. Malta's sales order confirmation, on the same terms and addressed to O.W. USA, is dated October 9, 2014 [Doc. 34-1].

O.W. Malta thereupon placed an order for the bunkers destined for the NORWEGIAN SPIRIT with the company that would physically deliver the bunkers to the Vessel. This was a Greek company called EKO. EKO delivered the bunkers to the Vessel without incident as she lay at Pireaus on October 18, 2014. The NORWEGIAN SPIRIT then departed the port, refueled and presumably refreshed. It appears to be undisputed that EKO sent its invoice for the bunkers it supplied to O.W. Malta, which had ordered the bunkers from EKO, and O.W. Malta sent its invoice to O.W. USA, which had ordered the same bunkers from O.W. Malta. O.W. USA sent its invoice for the same bunkers to NCL. That invoice, dated October 18, 2014 [Doc. 2-4], was in the amount of $694,548.44. The due date was November 17, 2014.

Thus, as October yielded to November in 2014, and the NORWEGIAN SPIRIT continued on her voyage, there were three outstanding invoices for the bunkers delivered to the Vessel at Pireaus on October 8. In a well-ordered world these invoices would have been promptly paid, but disorder intruded when, on November 7, the parent company, O.W. Bunker, filed insolvency proceedings in Denmark. The global O.W. Bunker group stopped paying invoices submitted by

local physical suppliers like EKO, resulting in a tsunami-like tidal wave of multi-jurisdiction litigation, of which the case at bar is one.

III

On November 13, 2014, after all three bunker invoices had been issued, but before payment became due or was made on any of them, O.W. USA filed in this District a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.[2] Compl. ¶ 5. *See also* Bankr. Petition, Case No. 14-51720. The OWB USA Liquidating Trust was created by the Debtors' First Modified Liquidation Plans, confirmed by the Bankruptcy Court for this District. Compl. ¶ 6. Defendant Kelly Beaudin Stapleton ("Beaudin Stapleton" or "the Trustee"), a citizen of Pennsylvania, was named the Liquidating Trustee. *Id.* ¶¶ 6-7.

Following the O.W. group bankruptcy filings, EKO reached the sensible conclusion that if it wished its invoice for bunkers delivered to the NORWEGIAN SPIRIT to be paid, it would have to look elsewhere than an O.W. Bunker company. EKO's gaze fell upon NCL *in personam* and the NORWEGIAN SPIRIT *in rem*. According to the sworn declaration of Ioannis A. Voskos, legal counsel to EKO [Doc. 2-8], EKO made demand on NCL for payment of EKO's invoice, and informed NCL that EKO would "immediately arrest the NORWEGIAN SPIRIT, if the O.W. debt was not paid in full." Voskos Decl. paragraph 5. In order to avoid the arrest and detention of the Vessel, laden with passengers and the crew serving them, NCL paid EKO $729,929.09, the total

---

[2] It appears that O.W. USA, a Texas corporation with its principal place of business in Texas, filed its voluntary bankruptcy petition in this District based upon the Connecticut citizenship of its subsidiary holding company, O.W. Bunker Holding North America, Inc., a Connecticut corporation with its principal place of business in Stamford. *See* Bankr. Petition, Case No. 14-51720, at 14.

5

amount of the invoices EKO rendered to O.W. Malta for the bunkers delivered to the Vessel at Pireaus on October 8, 2014. Beaudin Stapleton, the O.W. USA Liquidating Trustee, whose functions include collecting debts owed to O.W. USA, takes the position that NCL must pay O.W. USA's invoice for the same bunkers, in the amount of $694,548.44. The Trustee professes herself to be unmoved by the fact that NCL has previously paid EKO a slightly larger amount for the same bunkers. NCL made that payment, the Trustee contends through counsel, as a volunteer, without effect upon NCL's obligation to pay the O.W. USA invoice. NCL responds that in the circumstances of the case, it is not liable to pay that invoice.

To resolve that dispute, the O.W. Liquidating Trust has instructed United Kingdom counsel to commence arbitration proceedings against NCL in London. The Trust contends that an arbitration clause in the underlying sales contract between NCL and O.W. USA obligates NCL to participate in the London arbitration. NCL makes two responses. The first is that by virtue of its prior payment to EKO for these bunkers, it is under no liability to pay O.W. USA for them. That is a substantive question of law and equity. NCL's second response is that on a proper construction of the underlying contract, it has not agreed to arbitrate this dispute, in London or anywhere else. That is a question of contract law, as are all issues of whether a party has agreed to arbitrate a particular dispute.

While NCL initially sought to raise these questions in the Bankruptcy Court, Chief Judge Manning concluded that Court lacked subject matter jurisdiction, and dismissed NCL's adversary proceeding without prejudice. *See* Order of Dismissal, Adversary Proceeding No. 17-05008 (JAM) Doc. 55, Aug. 16, 2017. This action in this Court followed. NCL's complaint prays for a declaration of non-liability with respect to the O.W. USA bunkers invoice, and an injunction against

arbitrating that issue.

The case is now before the Court on NCL's self-styled "emergency" motion to stay or enjoin the London arbitration. The parties stipulated to stay the arbitration (for which the parties have appointed arbitrators) until the Court decides the motion. The issues have been elaborately briefed and counsel presented oral arguments at a hearing.

IV

If NCL agreed to arbitrate this dispute with O.W. USA (as O.W. USA contends and NCL denies), it is because of the "OW Bunker Group Terms and Conditions for Sale of Marine Bunkers" [Doc. 2-5] (sometimes referred to herein as "the OWB T&C"), which were incorporated by reference in the sales order confirmation sent by O.W. USA to NCL on October 8, 2014.

Article B, the "Definitions" section of the OWB T&C, specifies at subparagraph B.1 that for purposes of the contracted-for bunkers delivery, O.W. USA is the "Seller" and NCL is the "Buyer."

Article P, captioned "Law and Jurisdiction," provides in pertinent part:

> P.1   This Agreement shall be governed and construed in accordance with English law. . . .
> Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating thereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act of 1996 (or any subsequent amendment).[3]
>
> P.2   In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the

---

[3]   Clause P.5 refers to the application of the general maritime law of the United States with respect to the existence of a maritime lien, in circumstances which are not presented by the case at bar.

Buyer, and one by the two arbitrators already appointed. . . .

These provisions are preceded and governed by Article L, captioned "Exemptions and Force Majeure," which provides in Article L.4 in pertinent part:

> (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.
>
> (b)    Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include: . . . .
>
> (iii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.[4]

NCL contends that "the physical supply of the Bunkers" to the NORWEGIAN SPIRIT was "undertaken" by EKO, "a third party" which "insists that the Buyer [NCL] is also bound by its terms and conditions," all within the meaning of Article L.4 (a) of the OWB T&C. In those circumstances, NCL's argument emphasizes, the O.W. Bunker "Terms and Conditions shall be varied accordingly," Article L.4 (a), and, because EKO's terms and conditions provide for the exclusive jurisdiction of "Pireaus Courts" over any dispute in connection with this bunkering, the OWB T&C provision for arbitration in London is abrogated, pursuant to Article L.4 (b)(iii).

O.W. USA and the Trustee contend that the factual predicate for NCL's contentions does not exist, and in any event, those contentions misread the provision for London arbitration contained in

---

[4] The printed text of the OWB T&Cs in the record [Doc. 2-5] contains a typographical error, in that there are two contiguous subparagraphs designated "(ii)." The subparagraph relevant to this case is the third subparagraph, "(iii)," the designation that is used hereafter.

the contract between O.W. USA and NCL.

V

NCL begins its complaint [Doc. 1] with the assertion that it is filed "pursuant to 28 U.S.C. § 2201," the Declaratory Judgment Act. The Court must at the threshold consider its jurisdiction, since it is well established that "the Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts. Rather, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Correspondent Servs. Corp. v. First Equities Corp. of Florida*, 442 F.3d 767, 769 (2d Cir. 2006) (citation omitted).

In this case, there are ample bases for the Court's subject matter jurisdiction. The complaint alleges diversity of citizenship pursuant to 28 U.S.C. § 1332. Diversity is adequately alleged. In addition, O.W. USA invoked federal jurisdiction by filing a voluntary Chapter 11 bankruptcy petition in this District. This Court's jurisdiction of bankruptcy cases is conferred by 28 U.S.C. § 1334, which extends to the Liquidating Trustee's attempted enforcement of the bunkers invoice as an asset of the debtor's estate. Moreover, O.W. USA, an American supplier of necessaries to a vessel in navigation on the order of her owner, has a maritime lien on the vessel pursuant to 46 U.S.C. § 31342(a), and the case falls within the Court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333. *See Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012) (where federal court would have admiralty jurisdiction over contract to deliver bunkers to vessels, "we have jurisdiction over this declaratory judgment action as well.").

Any one of these three bases for the Court's subject matter jurisdiction would suffice. All three are present. The Court may therefore consider the merits of the present motion, by which NCL seeks to stay or enjoin the London arbitration initiated by O.W. USA.

VI

Arbitration is frequently praised as a salutary alternative to litigation. However, there are occasions when arbitration generates litigation. One such occasion arises when a party, confronted by another party's demand for arbitration of a dispute between them, responds that there is no arbitration agreement justifying the demand.

This case presents that situation. O.W. USA demands that NCL participate in an arbitration in London to determine NCL's liability as to payment of the invoice O.W. USA sent to NCL for the value of the bunkers delivered to the NORWEGIAN SPIRIT by the Greek supplier EKO at the port of Pireaus on October 18, 2014. NCL responds that, in the particular circumstances attending that bunkering, there is no contract between O.W. USA and NCL obligating NCL to arbitrate O.W. USA's claim in London. NCL bases that contention upon its interpretation of certain provisions in the OWB T&C, which both parties agree were incorporated by reference in the sales order for the bunkers delivery in question. O.W. USA contends that on a proper construction of the OWB T&C, the parties' contractual obligation to arbitrate disputes in London is not affected by events at the bunkers delivery port of Pireaus.

The case turns, then, upon whether NCL agreed to a contract which obligates it to participate in a London arbitration. That is a decisive element in light of the principle declared by the Supreme Court in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960): "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." While *Steelworkers* was decided in the context of the federal labor management relations statute, its concept of arbitration as a creation of contract, broadly stated, is broadly applied. *See, e.g., In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d

113, 127 (2d Cir. 2011) (citing and quoting *Steelworkers* in an action brought by investors against a financial services company).

A related and equally established principle is stated in *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010): "It is well settled in both commercial and labor cases that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." (citations and internal quotation marks omitted). Supreme Court decisions uniformly reach that conclusion. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986). In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), the threshold question was whether the court or an arbitrator should decide if arbitration provisions in a collective-bargaining contract survived a corporate merger so as to bind the surviving corporation. The Court reasoned that this question was for the courts:

> Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties. . . . The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty.

*Id*. at 546-47 (ellipsis omitted).

In the case at bar, it is for this Court, whose subject matter jurisdiction is manifest, and not for London arbitrators (however distinguished), to decide whether (as NCL contends) Article L.4 of OWB T&C operates to vary and supersede the London arbitration clause contained in Article P.1 of that document; or whether (as O.W. USA contends) the London arbitration clause is unaffected

and remains fully enforceable.  Under these Supreme Court cases and their progeny, that question of contractual construction falls to this Court to decide.


## VII

As noted *supra*, the O.W. Bunker Group Terms and Conditions provide in Article P.1: "This Agreement shall be governed and construed in accordance with English law."  The parties' submissions assume that this choice of law applies to the decision this Court must make.  The assumption is warranted.  The contractual choice of English law was made by two substantial and sophisticated parties.  I do not suggest the choice of law was negotiated.  It is clear enough from the record that O.W. imposed its Terms and Conditions upon shipowners needing bunkers, and a shipowner unwilling to accept the choice of English law would probably have to find a different bunkers broker or supplier.  But there is no reason to reject this choice of law.  I accept that English law governs the contract between O.W. USA and NCL, and in addressing the question posed in Part VI of this Ruling, this Court must construe the contract according to English law.

The competence of this United States district court to decide that question of foreign law is declared and governed by Federal Rule of Civil Procedure 44.1, which provides: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."

The Advisory Committee's Notes to the Rule state: "In further recognition of the peculiar nature of the issue of foreign law, the new rule provides that in determining this law the court is not limited by material presented by the parties; it may engage in its own research and consider any

relevant material thus found. . . .  Rather, the rule provides flexible procedures for presenting and

utilizing material on issues of foreign law by which a sound result can be reached with fairness to

the parties."

In *Faggionato v. Lerner*, 500 F. Supp. 2d 237 (S.D.N.Y. 2007), Judge Preska said:

> Ultimately, the responsibility for correctly identifying and applying
> foreign law rests with the court.  In acting under Rule 44.1, a court
> may reject even uncontradicted expert testimony and reach its own
> decisions on the basis of independent examination of foreign legal
> authorities.  The Court of Appeals has urged district courts to invoke
> the flexible provisions of Rule 44.1 . . . .

*Id.* at 244-45 (citations and internal quotation marks omitted).

While district judges are endowed with broad flexibility in determining foreign law, one is

also acutely aware of the provision in the last sentence of Rule 44.1 that the district court's

"determination must be treated as a ruling on a question of law."  The intended distinction is

between a "finding of fact," where the less demanding standard of review on appeal is "clearly

erroneous," and a "question of law," which the court of appeals considers *de novo*.  District judges

may enjoy the flexibility of research the Rule provides, but they know their determinations of

foreign law will receive no deference from circuit judges if the case sails from the shallows into

deeper appellate waters.

In the case at bar, I have the benefit of opinions submitted by two English barristers, each

with notable litigation and arbitration experience in the relevant areas of international trade,

commerce and shipping.  C. Marcus Mander is instructed on behalf of O.W. USA and the

Liquidating Trustee.  Chirag Karia QC is instructed on behalf of NCL.  Messrs. Mander and Karia

exchanged a series of expert declarations which began when the case was before the Bankruptcy

Court and continued after it moved to this Court.  Specifically, I have considered the following

declarations, signed on the indicated dates: Mander, June 6, 2017; Karia, June 16, 2017; Mander, June 23, 2017; Karia, September 14, 2017; and Mander, September 22, 2017.[5]  Some declarations answer or criticize opposing declarations.  English appellate decisions and pages from academic texts are attached as exhibits.  The submissions of these barristers constitute an enlightened and stimulating symposium on English law.  As one would expect, the two barristers do not entirely agree with each other.

## VIII

Mr. Karia's declaration, dated June 16, 2017, states in paragraph 7 that "on the applicable English law," the "proper construction and effect of clause L.4" of the OWB T&C is set out in paragraph 14 of his declaration.[6]  "In my opinion," Mr. Karia says in paragraph 14, "clause L.4 operates as follows:"

> The *prima facie* position is that the contract between the Seller [O.W. USA] and the Buyer [NCL] is subject to the OWB T&Cs, including the English law and London arbitration clause in clause P.1.  Clause L.4, however, makes an exception to that *prima facie* rule when the third party physically supplying the bunkers to the Buyer (i.e. "the physical supplier" – here, EKO) "*insists that the Buyer is also bound by its* [i.e. the physical supplier's] *own terms and conditions.*"  Clause L.4(a).  In that situation, the Contract is varied so as to incorporate that physical supplier's standard terms and conditions, which then take precedence over the OWB T&Cs.  Clause L.4(b), which is expressly stated to be "*without prejudice or limitation to the*

---

[5] Mr. Mander's declarations of June 6 and September 22 and both of Mr. Karia's declarations were filed on the docket of this district court case.  *See* Docs. 34-2, 39-1, 44-1, 45-1.  As to Mr. Mander's declaration of June 23, 2017, I reference the copy filed on that date in NCL's bankruptcy action.  *See* Bankr. Case No. 17-05008, Doc. 39.

[6] Mr. Karia refers to the "clauses" of the O.W. Bunker Group Terms and Conditions.  The document itself refers to its component parts as "Articles," the designation I use in this Ruling.  The nouns are, of course, synonymous.

*generality of*" clause L.4(a), then deals specifically with the incorporation of certain specific types of terms from the physical supplier's standard terms and conditions. Pursuant to clause L.4(b)(iii), if the physical supplier's standard terms and conditions include "*a different law and/or forum selection for disputes . . . then such law and/or forum shall be incorporated into* " the OWB T&Cs. The new law and/or forum clause then replaces and supersedes the choice of English law and London arbitration in clause P.1.

Mr Karia's opinion, as reproduced herein, is adapted from paragraphs 14.1-14.6 of his June 16 declaration. The ultimate effect of this contractual replacement and superseding is described by Mr. Karia in paragraphs 7.1 and 7.2 of his declaration:

> Where the physical supplier has insisted that the Buyer is also bound by the physical supplier's terms, those terms will be incorporated into the Contract and supersede any inconsistent terms in the OWB T&Cs.

> If clause L.4 is found to have been triggered in the present case, the whole of the Contract will be governed by Greek law and all disputes arising in connection with the Contract will be subject to the exclusive jurisdiction of the Greek Courts.

These passages express, it is worth repeating, Mr. Karia's opinion as to the proper construction and effect of the OWB T&Cs under English law.

Mr. Karia's declaration of June 16 disagrees in some respects with Mr. Mander's earlier, initial declaration dated June 6, 2017. In that declaration, Mr. Mander summarized his opinion at paragraph 4:

> In summary, at least on present information, in my opinion the Contract between the parties was not varied by operation of clause L.4 and is not governed by Greek law and subject to the jurisdiction of the Greek courts. That is because none of the preconditions to the application of clause L.4 have been satisfied. Further, even if they had been and EKO's terms and conditions had been incorporated into the Contract as a result, it would not follow that EKO's terms were incorporated for all purposes, so that disputes between OWB USA and the Plaintiff [NCL] concerning payment of the price are also subject to Greek jurisdiction. Finally, even if that is wrong, the

attempt to incorporate a Greek jurisdiction clause does not comply with applicable European law requirements and is thus prima facie ineffective or unenforceable.

The body of Mr. Mander's declaration reveals that the principal unsatisfied precondition to the application of Article (or clause) L.4, in his view, is "insistence" by EKO, the physical supplier, that the Buyer accept EKO's terms and conditions. On that point, Mr. Mander says that clause L.4 "is only applicable if the third party 'insists' that 'the Buyer' is bound by its terms and conditions"; that "the word 'insist' should be given its ordinary meaning," a proposition "supported by the final sentence of clause (a), which indicates that the terms must have been 'imposed' on the Buyer"; and that "in the present case, I have not yet seen anything which could be said to amount to any kind of imposition or insistence at all, and nothing to suggest that, if there was any imposition or insistence, that it related to the Plaintiff [NCL]." June 6 declaration at paragraphs 38 and 40.

Second, Mr. Mander observes that L.4 provides, "the OWB T&Cs are to be *varied,* rather than replaced wholesale, and it is thus necessary to ask to what extent they are varied." Paragraph 41 (emphasis in the original). In that regard, Mr. Mander opines, NCL's contention that as far as forum selection and governing law is concerned, L.4 replaces clause P.1 for all purposes "does not necessarily follow," and he continues: "In short, the presumption that, if clause L.4 is triggered, that necessarily means that OWB USA's claim for the price is subject to the jurisdiction of the Greek courts, does not automatically follow as a matter of English law." Paragraphs 41, 43.

Mr. Karia's declaration of June 16 expresses different views on both these points. As to the meaning of the verb "insist," Mr. Karia says at paragraph 16:

> Although I agree with Mr. Mander that the word "*insist*" in clause L.4 is not a term of art, it should be interpreted in the context in which it appears, which is in a bunker sale contract in which the physical supplier is unlikely to be an OWB Group company. In my opinion,

> "*insist*" in this context is best understood as meaning "require" or
> "demand".

(Footnote omitted). While Mr. Karia also agrees with Mr. Mander that "the insistence from the physical supplier must be '*that the Buyer* [here, NCL] *is also bound by its own terms*,'" Mr. Karia adds this analysis:

> In my opinion, that insistence could be directed to the Buyer itself –
> for example by way of a term in a delivery note or a request to the
> Buyer/ship prior to the delivery of the bunkers – or to any OWB
> Group entity (which I assume also contract with each other of the
> OWB T&Cs) in the chain of suppliers. The commercial purpose of
> L.4 appears to be to ensure that the rights and liabilities of the OWB
> Group entities vis-á-vis the Buyer match – in other words, are "back-
> to-back" with – their rights and liabilities vis-á-vis the physical
> supplier.

Paragraph 17. On this interpretation, Article L.4 in the O.W. USA – NCL contract could be triggered by "insistence from EKO directed to OWB Malta," as well as from EKO to NCL. Paragraph 18.

As for Mr. Mander's suggestion that Article L.4's law and jurisdiction provision for the physical supplier's T&Cs (here, Greek law and Greek jurisdiction) would have a limited application to only "undefined parts" of the O.W. USA – NCL contract, Mr. Karia's view is "that suggestion has no support whatsoever in the text of clause L.4 and is contrary to principle." Paragraph 20. Mr. Karia expands on that point:

> in my opinion, it is clear upon reading clause L.4 as a whole (as it
> must be) that the "*different law and/or forum selection*" clause in the
> physical supplier's terms and conditions is to replace and supersede
> the provisions of clause P.1. In my opinion, that is the only
> reasonable construction of clause L.4.

Paragraph 21.

Mr. Karia's June 16 declaration does not persuade Mr. Mander, who ripostes in a

supplemental declaration dated June 23, 2017.

As for the meaning to be ascribed to the word "insist," Mr. Mander states explicitly at paragraph 3: "I disagree with the final sentence of Karia ¶ 16." That is the portion of his June 16 declaration where Mr. Karia opines that when construing Article L.4 of the OWB T&Cs, the word "insist" is "best understood as meaning 'require' or 'demand.'" Mr. Mander begins the reasons for his disagreement by saying: "Particularly where the parties use an unusual word in their contract, such as 'insist,' the correct approach is to give that word its ordinary meaning in accordance with the principles laid down in cases such as *Arnold v. Britton* (and *Wood v. Capita*),[7] unless there is something in the rest of the document or in the factual background which indicates that another meaning was intended." Paragraph 3. Mr. Mander's ensuing discussion, which considers various provisions in the contract between O.W. USA and NCL and events occurring at the bunkers delivery port, leaves me in some doubt as to whether Mr. Mander rejects Mr. Karia's definition of "insist" because it disregards the word's "ordinary meaning" (which Mr. Mander does not provide), or because the text of the contract and surrounding factual circumstances indicate a meaning of "insist" different from "require" or "demand," the meanings contended for by Mr. Karia. However, it is clear enough that Mr. Mander does not accept Mr. Karia's meanings; Mr. Mander sums up the point in paragraph 11 of his June 23 declaration:

> While I acknowledge that there is scope for argument, therefore, I do not think that Mr. Karia's views expressed in ¶¶ 17 and 18 of his Declaration are correct. In my view, the various competing considerations point to the conclusion that the relevant "insistence" and "imposition" needs to be at the time of contracting, so that the parties can know where they stand when they are performing their

---

[7] These are decisions of the English Supreme Court (formerly the Law Lords of the House of Lords).

contract, and to be directed at the Seller (whether alone or in addition to the Buyer).

As for Mr. Karia's criticism of Mr. Mander for the latter's suggestion that "differing governing laws [may] apply to different obligations" in a single contract, Mr. Mander says in his June 23 supplemental declaration at paragraph 12.1 that "there is no objection to it in principle and Mr. Karia seriously overstates the position in opining otherwise." Mr. Mander offers criticism of his own when he says that Mr. Karia "assumes that it [clause L.4] effectively simplifies matters by ousting clause P in its entirety," an assumption Mr. Mander challenges with this reasoning:

> [B]ut that is not what the clause says. Clause L.4 says only that the contract is to "incorporate" the physical supplier's law and jurisdiction clause, and does not address the effect of that on clause P, in the context of a contract which already includes split governing law and jurisdiction provisions. It seems to me that, while the line may not always be easy to draw, the conclusion that the parties intended disputes concerning the performance of the physical supplier (e.g. the quality of the bunkers) to be determined in accordance with the law and jurisdiction provisions of the physical supplier's contract, but disputes arising as between the Buyer and the Seller (including questions of "general obligation", such as contract validity) to continue to be determined in accordance with clause P, makes practical and commercial sense. By contrast, the conclusion that the parties entered into their contract not necessarily knowing what law or jurisdiction provisions might apply to their respective fundamental obligations is a very surprising one. . . . If the Plaintiff's [NCL's] construction is correct, therefore, the practical result is a legal lottery, which (whether assessed objectively or subjectively) is highly unlikely to have been intended . . . .

Paragraph 14.

Mr. Karia was moved to respond with a supplemental declaration of his own, dated September 14, 2017, by which time the lines of battle had moved from the waters of the Bankruptcy Court to those of this Court. Mr. Karia reaffirms in paragraph 15 "my analysis of how clause L.4 should be interpreted, in particular in relation to the issue of to whom the physical supplier of

bunkers must '*insist*' that the Buyer (NCL) be bound by its (the physical supplier's) terms and conditions."  He then notes the different view on the meaning of "insistence" expressed by Mr. Mander, "with which," Mr. Karia adds, "I respectfully disagree."  Paragraph 16.  Against that background, Mr. Karia discusses in his September 14 declaration the rule of *contra proferentem*, as it might be applied under English law to the contract between O.W. USA and NCL.  Mr. Mander responds to Mr. Karia's supplemental declaration of September 14 with his second supplemental declaration dated September 22, 2017, the last broadside in the battle.

On the question of *contra proferentem*, these concluding declarations reveal substantial agreement between the two barristers.  Mr. Mander says in paragraph 4 of his September 22 declaration: "I have read and agree with Mr. Karia's summary of the *contra proferentem* rule in English law at ¶¶ 7-12 of his Supplementary Declaration."  Mr. Karia's declaration at paragraph 12 (with which Mr. Mander expresses his agreement) says that under English law, "the *contra proferentem* rule is to be used as a last resort, only where there is genuine ambiguity in the meaning of a contractual provision."[8]

Mr. Mander accurately points out in his declaration at paragraph 8 that "neither I nor Mr. Karia considered it necessary to resort to the *contra proferentem* principle in our original Declarations."  The reason is readily apparent.  While not so bluntly expressed, Mr. Karia regarded

---

[8]  I note, *en passant* and not as part of the *ratio decidendi* for the Ruling, that this conception of *contra proferentem* accords with American law.  The Second Circuit has said recently: "If a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract.  If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the assured."  *Hastings Dev., LLC v. Evanston Ins. Co.*, No. 15-3816, __ F. App'x __, 2017 WL 2923921 (2d Cir. July 10, 2017) (citations and internal quotation marks omitted).

his interpretation of the contract as clearly and unambiguously correct and Mr. Mander's interpretation clearly wrong. Mr. Mander regarded his interpretation of the contract as clearly and unambiguously correct and Mr. Karia's interpretation clearly wrong. The earlier declarations consist of contentions why one or the other position is correct. The *contra proferentem* seed does not grow in the stony soil of advocates' certitude. Neither side planted it.

Mr. Mander's latest declaration adheres to his previously expressed position. He says in paragraph 9 of his September 22 declaration: "I do not agree that the *contra proferentem* principle is engaged in this case." If I accept that view, that disposes of the issue. Mr. Karia, in his September 14 declaration, takes the analysis one step further. He adheres to his original opinions on the contract's meaning and effect, reaffirms his disagreement with Mr. Mander's views on that score, and then preserves for the *contra proferentem* principle a possible office to perform under English law. Mr. Karia says at paragraphs 16-18:

> In light of those arguments expressed by Mr. Mander (with which I respectfully disagree), it is possible that an English court would conclude that there was genuine ambiguity as to the meaning of clause L.4, and in particular in relation to the issue of to whom the physical supplier of bunkers must "*insist*" that the Buyer (NCL) be bound by its (the physical supplier's) terms and conditions.
>
> If the court were to reach that view (and, given the difference of opinion between myself and Mr. Mander, I would consider it justified in doing so) the application of the *contra proferentem* rule (as a last resort) would lead to the conclusion that NCL's interpretation should be preferred. That gives effect to the justification for the rule, namely that OWB USA drafted its own standard terms and conditions which included clause L.4 (presumably with a view to keeping itself in a back-to-back position with the physical supplier's terms and conditions), and was in a position to ensure that they were clear and unambiguous.
>
> For those reasons, if the court, notwithstanding the differing opinions expressed by myself and Mr. Mander, remains unsure of the meaning

of clause L.4, it would be wholly justified as a matter of English law in construing it against OWB USA, which was the party which drafted the provision.

Karia Decl. of Sept. 14, 2017(citation omitted).

I have carefully considered the declarations of these able and experienced barristers in order to derive from them such assistance as I may in answering the core question posed by the present motion:  Whether, on a proper construction under English law of the contract between O.W. USA and NCL and in the particular circumstances of this case,  NCL agreed to London arbitration of its dispute with O.W. USA about NCL's liability to pay O.W. USA for the bunkers supplied to the M/V NORWEGIAN SPIRIT in Pireaus, Greece on October 18, 2014.  I turn to this Court's resolution of that question.

## IX

I begin with a consideration of the relevant events occurring at Pireaus.  While the present record is not as complete as it might be, it does establish certain facts, and the submissions of the parties indicate that other facts are undisputed or indisputable.  The facts I take to be established are as follows.

The Greek company known as EKO was the physical supplier of the bunkers to the NORWEGIAN SPIRIT.  EKO contracted for that purpose as the seller under a contract with O.W. Malta as the buyer.  The chain of contracts presented by the case is summarized in Mr. Mander's declaration of June 6, 2017, at paragraph 35: "[I]n this case, the Plaintiff [NCL] contracted with OWB USA; OWB USA sub-contracted the supply to [OWB Malta]; and the latter sub-contracted the supply to EKO."  (Footnote omitted).

The declaration of Ioannis A. Voskos [Doc. 2-8], a Greek attorney and legal counsel to EKO,

states at paragraph 7: "EKO's standard General Terms and Conditions [], in force and applicable at the time of the sale and delivery of the subject bunkers to NCL in Pireaus, Greece provided for exclusive application of Greek Law and forum/jurisdiction in the Pireaus Courts in Greece, and were known to OW [at] that time."

At the time EKO delivered the bunkers to the NORWEGIAN SPIRIT, an EKO employee presented to the Chief Engineer of the Vessel a document referred to in the business as a "Bunker Delivery Note" ("BDN") or a "Delivery Ticket." The latter phrase is used by Filippos A. Digkas, a Greek attorney who submitted a declaration [Doc. 2-7] on behalf of NCL. According to Mr. Digkas's declaration, the Chief Engineer affixed his seal on the Delivery Ticket and signed it. The document recited (translated from the Greek original text) that "the above quantity [of bunkers] has been received for the account of the vessel/owners . . . ." Mr. Digkas opines in paragraph 6 of his declaration: "Such signature [of the Chief Engineer] could, in my opinion, be construed as creating a contractual liability of the owner of the Vessel to pay the value of the bunkers delivered under the Delivery Tickets, such as by way of a guarantee of OW's debt to EKO, or of an acknowledgment of OW's debt, or of a cumulative undertaking on the owner's part to pay OW's debt." Those circumstances led Mr. Digkas to express the further opinion that, if O.W. Malta did not pay EKO's invoice, "there were sound bases under which the M/V NORWEGIAN SPIRIT could be subject to adverse actions including, but not limited to, arrest of the vessel by EKO."

That melancholy possibility came to pass when, a month later, the O.W. Bunker parent company collapsed into insolvency in Denmark, the O.W. Bunker Group of affiliated companies ceased operations, and O.W. Malta failed to pay EKO's invoice for the bunkers delivered to the NORWEGIAN SPIRIT. Mr. Voskos, the Greek attorney for EKO, describes in his declaration at

paragraphs 4 and 5 what EKO did next:

> As a result of O.W. Bunker's failure to make payment of the amount due and payable to EKO for fuel supplied to the M/V NORWEGIAN SPIRIT, EKO made demand on "NORWEGIAN SPIRIT LTD" (the "Owners") and "NCL (BAHAMAS)[ LTD]" (the "Managers") to pay in full the total invoice amount, expressly rejecting all other forms of security offered by NCL. As security for payment of the outstanding claim, EKO informed the Owners and Managers that EKO would have immediately arrest [*sic*] the M/V NORWEGIAN SPIRIT, if the O.W. debt was not paid in full.

NCL thereupon paid EKO the amount of EKO's invoice, in the amount of $729,929.09.


## X

It is in these circumstances that the first question of interpretation of the O.W. USA – NCL contract arises. Do the relevant events at Pireaus establish a situation "where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions," as that language is used in Article L.4 of the contract? EKO is obviously a third party undertaking to supply the bunkers. No one contends otherwise. The decisive question is whether EKO manifested the requisite insistence upon its terms and conditions for the value of the bunkers EKO supplied to the NORWEGIAN SPIRIT in such a way as to vary, vacate and supersede the London arbitration clause in the contract between O.W. USA and NCL. Mr. Karia and Mr. Mander both undertake to apply English law in answering that question. Mr. Karia opines the answer is "Yes." Mr. Mander opines it is "No." Their declarations give voice to the argument in forceful and lucid terms.

To recapitulate: Clause (or Article) L.4(a) of the OWB T&Cs provides that if "the physical supply of the Bunkers is being undertaken by a third party which *insists* that the Buyer is also bound

by its terms and conditions," the OWB T&Cs "shall be varied accordingly."  Clause L.4(b) follows

up on that language by providing that "in the event that the third party's terms include . . . (iii) a

different law and/or forum selection for disputes, then such law selection and/or forum shall be

*incorporated* into these terms and conditions."  (Emphasis added).

Mr. Karia opines that (1)  in this context "insist" means "require" or "demand"; and (2)  the

effect of "shall be incorporated" is to replace and supersede any inconsistent provisions in Article

P.1 of the OWB T&Cs (such as mandatory arbitration of disputes in London).  On the latter point,

Mr. Karia says: "In my opinion, that is the only reasonable construction of clause L.4."  Karia Decl.

of June 16, 2017, paragraph 21.

Mr. Mander characterizes the underlying contract as one where "the parties use an unusual

word in their contract, such as 'insist.'" Declaration dated June 23 at paragraph 3.  However, in his

subsequent declaration dated September 22, Mr. Mander says at paragraph 7 that the *contra

proferentem* principle does not apply to the case because "'insist' is an ordinary word with an

established meaning."

The verb's seeming change from an "unusual word" to an "ordinary word" may pique the

interest of etymologists, but for my part I think the meaning to be ascribed to "insist" is clear

enough.  My attention is not called to an English court decision defining the word.  I may be

excused, in a case governed by English law, for turning to a favorite source of enlightenment: the

Oxford English Dictionary ("OED").  The OED's fourth definition of "insist" is: "To make a demand

with persistent urgency; to take a persistent or peremptory stand in regard to a stipulation, claim,

demand, proposal, etc."  *Insist*, Oxford English Dictionary (compact ed., 23d prtg, 1984).  The OED

records Dr. Johnson's use of the word in 1778: "No good and worthy man will insist upon another

man's drinking wine."  Johnson lacked the benefit of a law degree – he left that to Boswell – but his authoritative use of the English language is legendary.  These passages in the OED are consistent with Mr. Karia's understanding of  "insist" to mean "request" or "demand."

Mr. Mander does not suggest a specific alternative meaning for "insist."  His argument depends, rather, upon the placement of the word within the greater context of the contract's provisions as a whole, a recognized principle of English law which I will consider *infra*.  For the present, I note Mr. Mander's contention that "what is intended is that the OWB T&Cs are to be *varied*, rather than replaced wholesale," June 6 declaration at paragraph 41, coupled with his observation that "Clause L.4 says only that the contract is to 'incorporate' the physical supplier's law and jurisdiction clause, and does not address the effect of that on clause P," June 23 declaration at paragraph 14.  I take those passages to constitute Mr. Mander's submission that Mr. Karia was wrong in concluding clause L.4, if applicable, replaces and supercedes clause P.1.  I cannot accept that submission.  No English case is cited  supporting it.  The submission runs counter to the words used.  Language *incorporated* into a document takes its place in that document,  says what it says, and does what it does.   Clause L.4(b)(iii) provides that a third party's "different law and/or forum selection for disputes to be determined" are "incorporated into" the OWB T&Cs, which have in clause P.1 their own law and forum selection provisions.  Diametrically different and mutually exclusive law and forum selection provisions co-exist in the same contract.  The only reasonable interpretation is that the incorporated provisions replace and supersede the provisions into which they are incorporated.  This interpretation is consistent with the introductory provision in clause L.4(a): if a third party's terms and conditions are applicable, the OWB T&Cs are "varied accordingly."  "Varied" means "changed."  The OWB T&C law and forum selection provisions are

*changed* when the EKO provisions *replace* them.  That is the only way to make sense of the matter.

Mr. Mander's declarations seem to me to argue for meanings or effects contrary to or inconsistent with the plain meaning of the words used in Article L.4 of the OWB T&Cs.  *Au fond* the case for O.W. USA is that when the provisions of L.4 are considered within the context of the contract as a whole, the interpretation for which Mr. Karia contends is so bad that it cannot be right – a "legal lottery," in Mr. Mander's vivid phrase – and could not have been intended by the parties at the time of contracting.  This argument is forcefully made, but I think it runs counter to a recent decision of the United Kingdom Supreme Court, which both barristers cite as declarative of current English law.

That decision is *Arnold v. Britton* [2015] UKSC 36.   The parties were the landlord/lessor of 25 chalets on the one hand, and the tenants/lessees of the chalets on the other.  At issue was a provision common to all the long term leases which, the landlord contended, required the lessee to pay a 90-pound (English currency) service charge for the first year of the term, and for each succeeding year a fixed sum representing a 10% increase on the previous year, resulting in "an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year." Judgment of Lord Neuberger at paragraph 5.  The original purpose was apparently to protect the landlord (who rendered services to the property paid for by the service charge) from the effect of inflation.  Over the years, however, the rate of inflation in the United Kingdom fell well below 10%, which prompted the tenants to contend that the landlord's "construction results in such an increasingly absurdly high annual service charge in the later years of each of the 25 leases that it cannot be right."  *Id*. at paragraph 10.

The Supreme Court rejected that contention.  Lord Neuberger's majority judgment (Lord

Carnwath filed a lone dissent) cites a number of House of Lords and Supreme Court cases which "discussed the correct approach to be adopted to the interpretation, or construction, of contracts," and then undertook to state the relevant principles (paras. 14-23), beginning with the declaration: "When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean." Paragraph 15 (internal quotation marks omitted). The first element in the assessment of meaning is "the natural and ordinary meaning of the clause," paragraph 15, an element whose importance prompts Lord Neuberger to voice this cautionary note in *Arnold* at paragraph 17:

> [T]he reliance placed in some cases on commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract.

(Citation omitted). In the present case, the language used in clause L.4 is "insists" and "shall be incorporated." It may not be entirely accurate to say that "both parties have control" over that language, since the O.W. Bunker Group clearly drafted that language in its Terms and Conditions, and did not negotiate it with customers, the likes of NCL. Nonetheless, NCL perforce agreed to the this language by placing the bunkers order for the NORWEGIAN SPIRIT, and the parties "have control over the language" used in the contract in the manner contemplated by the *Arnold* judgment.

It is apparent from the submissions on the present motion that O.W. USA is profoundly unhappy with NCL's interpretation of L.4, which, in respect of the bunkers supplied to the

NORWEGIAN SPIRIT, substitutes a Greek forum and Greek law for London arbitration and English law.  But the nature, even the extent, of O.W. USA's discontent count for little or nothing under the principles articulated by *Arnold*.  Lord Neuberger says in his judgment at paras. 19 and 20:

> The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. . . . [W]hile commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight.  The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed.  Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice.  Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

These considerations militate against this Court's accepting counsel's invitation to disregard clause L.4's natural language for the sake of a perceived greater harmony with other provisions of the contract.

Another salient feature of the present case is that the demand for arbitration in London and the pre-emptive litigation in this Court are both the result of a post-contracting event entirely beyond the parties' intentions or contemplation at the time of contracting.  I refer to the sudden (and seemingly unexpected) insolvency in Denmark of the O.W. Bunker Group parent company, which paralyzed the Group's global bunkering operations and precluded the O.W. interests from paying EKO's invoice for bunkering NCL's vessel.  It is fanciful to suggest that at the time O.W. USA and

NCL contracted for supplying bunkers to the NORWEGIAN SPIRIT, it occurred to either party to say or think about saying: "Let's provide for what happens if O.W. Bunker goes bankrupt in Denmark and the whole business crashes." The circumstances of the case bring it within the next principle identified by Lord Neuberger in paragraph 22 of the *Arnold* judgment:

> [I]n some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of the contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention.

In the case at bar, it may not be clear what the parties would have intended the contractual language to mean if they had contemplated the possibility (however remote) of the Danish parent company's insolvency. Messrs. Karia and Mander do not squarely address that circumstance. In any event, however, Lord Neuberger's later paragraphs in *Arnold* restate and reinforce the core importance of the language used in the contract. "[I]f, as I believe is clear," Lord Neuberger says at paragraph 28, "the purpose of the second part of the clause is to quantify the sum payable by way of service charge,"

> then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different meaning. As already explained, the mere fact that a party may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

His judgment rejects at paragraphs 29 and 32 the lessees' interpretation of the service charge clause because "this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments," a practice condemned since "[i]t involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there." By the same token, O.W.

USA's contentions in the present case may fairly be characterized as a departure from the natural meaning of the words "insists," "varied," and "incorporated," and an insertion into Article L.4 of the present contract different words, from other sources, which do violence to the meaning the language the parties used in the contract.

I think that to the extent the parties' contractual intent can be divined regarding the payment of a bunkers invoice in the event of O.W. Bunker's sudden insolvency, the answer is found in the provision of OWB T&C clause L.4 that a physical supplier's forum and law selections are paramount if the supplier "insists that the Buyer [here, NCL] is also bound by its own terms and conditions." That provision is not limited in any way; the language is broad enough to cover a situation where a supplier is not paid because an O.W. entity fails; and presumably the O.W. Bunker Group (which drafted the OWB T&Cs) regarded it as in O.W.'s best interests to have uniform treatment for physical suppliers of bunkers who insist on their own terms and conditions.

The declarations of Messrs. Karia and Mander cite and attach a number of English appellate court decisions. I have read them. They declare general principles, whose application is fact-specific. The Supreme Court's decision in *Arnold v. Britton* is for me the most instructive, and I have quoted Lord Neuberger's judgment at some length. Given the rationale in *Arnold* and the wording of the underlying contract between O.W. USA and NCL, I conclude that Mr. Karia has the better of it in opining under English law about the meaning of the contract, in particular Article L.4 thereof. That is to say: the natural language of Article L.4, if applicable to the case, has the effect of varying, vacating, and superseding the London arbitration clause in the underlying contract. O.W. USA's efforts to avoid that effect of Article L.4 by appealing to other provisions in the contract, perceived commercial common sense, or other like factors is impermissible under English law, as

articulated in a case like *Arnold.*

If I am wrong in that conclusion, we are left with a situation where Mr. Karia and Mr. Mander, each an outstanding English lawyer, express different and irreconcilable opinions about the meaning and effect of clause L.4 in this contract. I accept Mr. Karia's view that if those opinions were addressed to an English court, "it is possible that an English court would conclude that there was genuine ambiguity as to the meaning of clause L.4." September 14 declaration at paragraph 16. Indeed, I think it not only possible but a near certainty that an English judge would reach that conclusion; and as noted *supra*, Messrs. Mander and Karia agree that the *contra proferentem* rule is used "where there is genuine ambiguity in the meaning of a contractual provision." Consequently, and as an alternative basis for this Ruling, I apply the *contra proferentem* principle, accept NCL's interpretation of the contract, and reject that of O.W. USA.

XI

The remaining issue is whether the provisions of Article L.4 of the OWB T&Cs, as interpreted by NCL, apply to EKO's delivery of bunkers to the NORWEGIAN SPIRIT.

The question that arises is whether it may fairly be said that the physical supply of bunkers to the NORWEGIAN SPIRIT in Pireaus in October 2014 was undertaken by a "third party" (EKO) "which insists that the Buyer [NCL] is also bound by its own terms and conditions," within the meaning of that language appearing in clause L.4(a) of the OWB T&Cs.

Mr. Mander's June 6 declaration at paragraph 4 aptly characterizes that insistence by a physical supplier such as EKO as a "precondition to the application of clause L.4." Neither Mr. Mander nor Mr. Karia presume to opine as to whether, under English law, EKO in fact communicated that insistence to NCL with respect to the bunkers delivered to the NORWEGIAN

SPIRIT. In Mr. Mander's view, the present record is insufficient to resolve the question; to determine if the precondition has been satisfied, Mr. Mander says in his June 6 declaration at paragraph 40, it would be necessary "to examine the full exchanges between OWB Malta and EKO, and between OWB Malta and OWB USA, before any conclusions could be drawn, in order to see exactly what was discussed and agreed, and what was or was not imposed and insisted on and by whom."

Mr. Karia's June 16 declaration, having opined at paragraph 16 that in this context the word "insist" as applied to a physical bunker supplier like EKO "is best understood as meaning 'require' or 'demand,'" goes on to say at paragraph 17:

> I also agree [with Mr. Mander] that the insistence from the physical supplier must be "*that the Buyer* [here, NCL] *is also bound by its own terms.*" In my opinion, that insistence could be directed to the Buyer itself – for example by way of a term in a delivery note or a request to the Buyer/ship prior to the delivery of the bunkers – or to any OWB Group entity (which entities I assume also contract with each other on the OWB T&Cs) in the chain of suppliers.

Mr. Karia continues in this vein when he says at paragraph 18:

> [I]n my opinion, it is possible for clause L.4 in the OWB USA/NCL Contract to be triggered by the insistence from EKO directed to OWB Malta. Whether it does or not will depend on the exchanges and the precise terms of the OWB Malta /OWB USA contract. If that is on the OWB T&Cs, as I would expect it to be, then clause L.4 in both the OWB Malta/OWB USA and OWB USA/NCL contracts could well be triggered.

Mr. Karia's declaration then says at paragraph 19:

> It will be for the Court to determine whether, on the facts found, EKO insisted that the Buyer also be bound on EKO's standard terms and conditions within the meaning of clause L.4.

These quotations from their declarations reflect the barristers' implicit agreement that under

English law, communications between EKO and O.W. Malta, viewed together with communications between O.W. Malta and O.W. USA, may have the functional effect of EKO directing its insistence to NCL, thereby satisfying the precondition to clause L.4's applicability to the contract between O.W. USA and NCL.

This Court's determination of English law under Rule 44.1 of the Federal Rules of Civil Procedure includes that agreement between the Messrs. Mander and Karia, as far as it goes. But the barristers' agreement does not go so far as to resolve all related questions. Mr. Karia suggests that EKO's insistence "could be directed to the Buyer itself" (NCL) "by way of a term in a delivery note." June 16 declaration at paragraph 17. There is such a document in the record. EKO presented a "bunker delivery note" to the NORWEGIAN SPIRIT's Chief Engineer at Pireaus; the Chief Engineer stamped and signed it; the note recited (in translation) that the bunkers "has been received for the account of the vessel/owners"; and a Greek attorney has opined that the Chief Engineer's signature could be construed as creating a contractual liability on the part of the Vessel owner to pay for the bunkers. But that is a proposition of Greek law, and as for English law, Mr. Mander opines that "assuming no prior contract between the physical supplier and the Buyer, the BDN [bunker delivery note] would not be capable of having any contractual effect as between the physical supplier and the Buyer." June 23 declaration at paragraph 4.1.

I must confess that there is something surreal about debating whether EKO insisted on its terms and conditions for supplying bunkers to the NORWEGIAN SPIRIT and communicated that insistence to her owner, NCL. We may not know all the facts, but we know these, on the basis of declarations of attorneys with knowledge of the facts, and contemporaneous documents:

    \*  EKO was the physical supplier of bunkers to the NORWEGIAN SPIRIT.

34

* The bunkers were delivered to the Vessel by barge on October 18, 2014.

* At that time, EKO's general terms and conditions provided that the delivery was governed by Greek law and any disputes fell within the exclusive jurisdiction of the Pireaus Courts.

* The Chief Engineer of the Vessel signed bunkers delivery tickets (or notes) on October 18, 2014.

* EKO sent O.W. Malta three invoices dated October 31, 2014, as payment for the bunkers.

* When O.W. Malta failed to pay those invoices, EKO gave NCL notice that if O.W. Malta did not pay for the bunkers, EKO would cause the arrest of the NORWEGIAN SPIRIT to compel payment from that source.

* NCL thereupon paid EKO's claim.

One supposes that a lay citizen, neither blessed nor cursed with a legal education, would think this narrative disclosed a rather dramatic insistence by EKO that NCL had to pay for the Vessel's bunkers. However, the declarations on English law for both sides seem to conclude that the insistence of a third party physical supplier of bunkers on its terms and conditions, as contemplated by clause L.4, must be articulated, directed or made known at the time of contracting for the bunkers, or certainly before they were actually delivered to the NORWEGIAN SPIRIT. I can discern nothing in the Karia or Mander declarations suggesting that an English judge would regard EKO's threatened post-delivery arrest of the Vessel as probative of the question posed by clause L.4(a): whether EKO "insists that the Buyer is also bound by its own terms and conditions." Factoring the threatened arrest into that determination would not, it seems to me, be supported by English law; and I perforce share any inhibition an English judge might feel on the point, since my obligation under Rule 44.1 is to construe the contract under English law.

These reflections bring us back to the chain of the three back-to-back bunker supply contracts in this case, which Mr. Karia and Mr. Mander, although stating the proposition somewhat

differently, each regard as a possible source of EKO's pre-delivery insistence directed to NCL as Buyer. While Messrs. Karia and Mander say the evidentiary record is not complete on that subject, the present record is not without significant factual content.

Ioannis Voskos, a Greek attorney who is also legal counsel to EKO, says, at paragraph 7 of his declaration: "EKO's standard General Terms and Conditions[], in force and applicable at the time of the sale and delivery of the subject bunkers to NCL in Piraeus, Greece provided for exclusive application of Greek Law and forum/jurisdiction in the Pireaus Courts in Greece, *and were known to OW at that time*." Ex. G to Pl. Br. [Doc. 2-8] (emphasis added).

While Mr. Voskos gives no detail concerning an O.W. entity's knowledge of EKO's standard terms and conditions at the time of the NORWEGIAN SPIRIT bunkering, in the totality of circumstances that awareness is highly likely. EKO was, and seemingly remains, a major supplier of petroleum products in the area. The company's present name, according to Mr. Voskos, is "Hellenic Fuels and Lubricant Industrial and Commercial S.A." The former company name of EKO appears on the invoices EKO submitted to O.W. Malta for the bunkers delivered to the NORWEGIAN SPIRIT; "EKO" is described as "member of the Group Hellenic Petroleum A.E." The sales order confirmation O.W. Malta (as seller) sent to O.W. USA (as buyer) for the Vessel's bunkers recites the corporate names "O.W. Bunker Malta LTD." and "OWB Piraeus RS," with an address in Piraeus. Piraeus is one of the world's busiest ports, called at over the centuries by the world's fleet of cargo and passenger ships. It is established by this record that in October 2014, O.W. Malta and EKO were both operating in Piraeus. O.W. Malta was the regional affiliate of the world's largest bunker broker and supplier. EKO was a major local supplier of bunker fuels.

The evidence supports the fair inference, which I draw on the present motion, that EKO's

delivery of bunkers to the NORWEGIAN SPIRIT, in performance of its contract with O.W. Malta in this case, was preceded by bunker deliveries by EKO to different vessels under other contracts between EKO and O.W. Malta, in each of which EKO insisted upon the terms and conditions which Mr. Voskos identifies as part of EKO's standard business practice. The likely ubiquity of EKO's terms and conditions is suggested by their form, as illustrated by an exhibit in evidence [Doc. 2-6]. These T&Cs are expressed in that Legal English which is the *lingua franca* of contemporary commerce.

XII

I conclude that NCL is entitled to a preliminary injunction enjoining the arbitration in London demanded by O.W. USA and that company's Liquidating Trustee. That conclusion is based upon these reasons:

1.  Article L.4 of the contract for supply of bunkers to the M/V NORWEGIAN SPIRIT, between O.W. USA as Seller and NCL as Buyer, construed in accordance with English law, varies and supersedes the provisions in Article P.1 for governing English law and arbitration of disputes between those parties in London, if certain preconditions stated in Article L.4 appear to have been satisfied.

2.  In placing that construction upon the contract, I accept as more persuasive Mr. Karia's interpretation, to the extent it differs from that of Mr. Mander. Principally, that is because I think Mr. Karia's constructions hew more closely to the plain and ordinary meaning of the words the parties used in the contract.

3.  In the alternative, if the opinions of Mr. Karia and Mr. Mander are both regarded as well founded but their conclusions are irreconcilable, then these opinions demonstrate a genuine

ambiguity in respect of the meaning and effect of Article L.4.  In that event, the *contra proferentem* rule is applicable under English law, and the contract would be construed in a manner favorable to NCL.

4.   On the construction of the O.W. USA / NCL contract I accept for the purpose of this Ruling, Article L.4's provisions are triggered if the bunker sale is performed "in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions,"  Article L.4(a).  "[I]n the event that the third party terms include" a different law and/or forum selection for disputes, those different selections are "incorporated into" the contract.  Article L.4(b)(iii).

5.   In point of fact, the subject bunkers were supplied to the NORWEGIAN SPIRIT by a third party.  One must consider the relevant "circumstances" of that bunkering, in order to determine whether third-party law and forum  selection provisions contemplated by Article L.4(b)(iii) come into play.  The record on this motion discloses the facts set forth below.

6.   EKO undertook to supply the bunkers to the Vessel, pursuant to a contract between EKO (as Seller) and O.W. Malta (as Buyer).  The record does not contain a copy of that contract.  The Voskos declaration establishes that at that time, EKO's standard terms and conditions provided for Greek law and the exclusive jurisdiction of the Piraeus courts in respect of contractual disputes.  The presence of EKO and O.W. Malta in Piraeus, and the nature of those companies' businesses in that busy port city, give rise to the reasonable inference, which I draw, that O.W. Malta was aware of EKO's standard terms and conditions, and agreed to them when it placed with EKO the order for the bunkers destined for the NORWEGIAN SPIRIT.

7.   The same bunkers are also the subject of the other two contracts in the three-contract

chain of contracts involved in the case. O.W. Malta (cast as Seller) entered into a contract for the bunkers with O.W. USA (cast as Buyer). And, as noted at the beginning of this Ruling, O.W. USA (cast as Seller) entered into a contract for the bunkers with NCL (the Buyer). Both contracts are in the record. Each contract incorporated the O.W. Bunker Group Terms and Conditions. In consequence, each of these two contracts in the chain contained Article L.4.

8. I conclude that O.W. Malta, as Buyer of the NORWEGIAN SPIRIT's bunkers under its contract with EKO, knew of and agreed to be bound by EKO's standard terms and conditions, including law and forum selection provisions different from those contained in the OWB T&Cs. O.W. Malta purchased these bunkers from EKO in order to perform O.W. Malta's contract to sell the same amount of bunkers to O.W. USA, which had forged the first link in the chain by contracting to sell that amount of bunkers to NCL, so that the NORWEGIAN SPIRIT might be refueled in Piraeus on October 18, 2014. Nothing in these additional contracts amended EKO's standard terms and conditions or erased O.W. Malta's knowledge of and agreement to the EKO T&Cs. Given this chain of contracts, O.W. USA as Buyer from O.W. Malta, and NCL as Buyer from O.W. USA, impliedly knew of and agreed to the EKO terms and conditions. That is sufficient to satisfy the preconditions in the contract in suit to the application of Article L.4.

9. I understand from the declarations of Messrs. Karia and Mander that the reasoning set forth in the preceding paragraph accords with English law in principle, subject in practice to possible further factual inquiry. Mr. Karia suggests that it would be for the Court to find further facts about EKO's insistence on its own terms and conditions and their effect upon other entities. For the reasons stated in paragraph 6 of this Part, I think the presently known facts are sufficient to compel, certainly to allow, a relevant inference on those subjects.

10.  I conclude, therefore, that Article L.4 of the subject contract, and in particular Article L.4(b)(iii), apply to the parties' rights and obligations.  The result is that the provision in Article P.1 for arbitration of disputes in London is vacated and superseded.  In consequence, NCL is not under any binding agreement to arbitrate its disputes with O.W. USA in London.  It follows that NCL is entitled to a preliminary injunction enjoining the London arbitration demanded by O.W. USA and that company's Liquidating Trustee.

11.  The Court will issue a preliminary injunction at this time, rather than a final and permanent one, because in fairness O.W. USA should be given an opportunity to challenge the inference upon which this Ruling significantly depends: specifically, that at the time EKO supplied the contracted-for bunkers to the NORWEGIAN SPIRIT, O.W. Malta (and possibly other O.W. entities) knew about EKO's standard terms and conditions and agreed to them (or did not object to them).  Relevant evidence, tending to negate those propositions, must come from the O.W. interests, since the subject is entirely within the knowledge and control of the O.W. Group.  Such proof must be submitted not later than January 30, 2018, failing which the preliminary injunction will be made final and permanent.

12.  This District Court's authority to enjoin the London arbitration is derived in part from the Court of Appeals' decision in *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011), where the Second Circuit introduced the subject by saying: "The question of whether federal courts have the power to stay arbitration under the FAA (or any other authority) in an appropriate case is an open one in this Circuit." *Id.* at 139 (citation and internal

quotation marks omitted).[9]  The Court of Appeals began its analysis by noting that its prior decisions "suggest . . . that, at least where the court determines that the parties have not entered into a valid and binding arbitration agreement, the court has the authority to enjoin the arbitration proceedings," 672 F.3d at 140 (citations and parenthetical remarks omitted), and answered the posed question thus:

> If the parties to this appeal have not consented to arbitrate a claim, the district court was not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right.

*Id.* at 141.  While I do not deprecate O.W. USA's conduct in this case with the pejorative phrase "foisting upon," O.W. USA and its Liquidating Trustee have no "contractual right" to demand that NCL arbitrate this claim in London, because the relevant circumstances result in the superseding of the London arbitration clause in the contract.  The Court of Appeals' decision in *American Express* assures me that I am not "powerless" to preserve NCL from an arbitration to which O.W. USA is not contractually entitled; and the form that preservation takes is an injunction: "we have concluded," the Second Circuit said in *American Express*, "that a district court may properly enjoin arbitration proceedings that are not covered by a valid and binding arbitration agreement," 672 F.3d at 142.  The Second Circuit has adhered to the *American Express* decision.  In *Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority*, 764 F.3d 210 (2d Cir. 2014), the District Court enjoined arbitrations on the ground that institutional arbitration agreements and rules had been superseded by subsequently executed forum selection clauses.  The Court of Appeals, affirming those injunctions, said succinctly that the District Court "had authority to enjoin arbitration in both

---

9  "The FAA," to which the Second Circuit referred, is the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, which provides *inter alia* for petitions in United States district courts to compel arbitration in cases where the parties have agreed in writing to arbitrate disputes.

41

appeals. Federal courts generally have remedial power to stay arbitration. . . . . Moreover, we routinely enjoin out-of-state arbitrations." 764 F.3d at 213-14. It is arguable, given these Second Circuit rulings, that a preliminary injunction enjoining an arbitration in these particular circumstances does not depend for its issuance upon the movant's showing of irreparable harm if the injunction is not granted or likelihood of success on the merits, prerequisites for a preliminary injunction in other contexts. But I need not pursue that subject, because those conditions are satisfied in any event. The Second Circuit has also held that a movant "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (quoting *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979 (2d Cir. 1997)). A district court has added that "it is not merely expense that underlies the prohibition against forcing a party to arbitrate a dispute that it did not agree to arbitrate," but also the loss of that party's "right to have defendants' claims adjudicated in a court of law, rather than in an arbitral forum to whose jurisdiction it has not consented," leaving the non-consenting party with "no adequate remedy at law," if forced to arbitrate the claim. *UBS Sec. LLC v. Voegeli*, 684 F.Supp. 2d 351, 354 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011). As for NCL's likelihood of success on the issue of superseding the London arbitration clause, NCL satisfies that element for the reasons previously stated in this Ruling.

13. It is perhaps useful to emphasize what this Ruling decides and what it does not. The Ruling holds only that NCL is entitled to an order enjoining O.W. USA and its Liquidating Trustee from proceeding with an arbitration in London concerning the bunkers invoice in question. The Ruling reaches that conclusion because, for the reasons stated, the Court decides that there is no

written agreement obligating NCL to arbitrate that claim in that forum. In its complaint, NCL couples its request for injunctive relief with a prayer for a "judgment against Defendants O.W. and the Liquidating Trustee, declaring that NCL is entitled [to] equitable subrogation, setoff, recoupment, priority through payment under compulsion, or other recognition of the amount that it has already paid for the [bunkers] Order and thus is not liable to O.W. or the Liquidating Trustee for any amounts with respect to the Order." Doc. 1 at ¶ 46. This Ruling considers none of those issues. They may be litigated further in this Court or the Bankruptcy Court; or they may yet come to the attention of arbitrators in London, if O.W. USA and the Liquidating Trustee appeal from this Ruling (which is an appealable order under the statute) and obtain a reversal. These potential developments are for another day.

## XIII

For the foregoing reasons, NCL's "First Emergency Motion to Stay Arbitration Proceedings and/or Enjoin Defendants from Proceeding with Arbitration" [Doc. 2] is GRANTED. Accordingly, Plaintiff's "Second Emergency Motion for Temporary Restraining Order and Preliminary Injunction" [Doc. 15],[10] which sought much the same relief, is DENIED AS MOOT. A preliminary injunction consistent with this Ruling is being filed concurrently herewith.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         November 29, 2017

                                  /s/Charles S. Haight, Jr.
                                  CHARLES S. HAIGHT, JR.
                                  Senior United States District Judge

---

[10] Defendants' "Notice of Agreement to Stay of Further Proceedings" [Doc. 23], filed on August 22, 2017, agreed to a stay of arbitration pending resolution of the First Emergency Motion, rendering the Second Emergency Motion superfluous.